UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  7:13-CR-1154-12 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | McAllen, Texas |
| | ) | Thursday, November 13, 2014 |
| JOSE A. PADILLA, | ) | (10:55 a.m. to 11:10 a.m.) |
| | ) | (11:30 a.m. to 11:53 a.m.) |
| Defendant. | ) | (11:59 a.m. to 12:05 p.m.) |

SENTENCING

BEFORE THE HONORABLE RANDY CRANE,
UNITED STATES DISTRICT JUDGE

(SEALED BENCH CONFERENCE OMITTED)

Interpreter:            Elena Medrano

Court Recorder:         Rick Rodriguez

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES</u>:


For Plaintiff:              JAMES H. STURGIS, ESQ.
                            Assistant United States Attorney
                            1701 W. Business Hwy. 83
                            Suite 600
                            McAllen, TX 78501

For Defendant:              DENNIS RAMIREZ, ESQ.
                            111 N. Seventeenth Street
                            Suite D
                            Donna, TX 78537

U.S. Probation Office:      N. Canales
                            1701 W. Business Hwy. 83
                            Suite 729
                            McAllen, TX 78501

1    **McAllen, Texas; Thursday, November 13, 2014; 10:55 a.m.**

2    **(Interpreter Utilized for Translation)**

3    **(Call to Order)**

4    THE COURT:  Next, 13-CR-1154-12, *USA v. Jose A.*

5    *Padilla.*

6    MR. STURGIS:  The Government is present and ready.

7    MR. RAMIREZ:  Good morning, your Honor.  Dennis

8    Ramirez for Mr. Padilla.  He is present and ready.

9    THE COURT:  All right, good morning, Mr. Padilla.

10    THE DEFENDANT:  Good morning, your Honor.

11    THE COURT:  There was a Presentence Report prepared

12    about you in this case.  Did you get a chance to review that

13    report with your lawyer?

14    THE DEFENDANT:  Yes, your Honor.

15    THE COURT:  Did you have any questions about it that

16    your lawyer could not answer for you?

17    THE DEFENDANT:  No, your Honor.

18    THE COURT:  And is everything about you correct in

19    the Presentence Report?

20    MR. RAMIREZ:  Your Honor --

21    THE COURT:  Other than the dollar amounts.  I know

22    there's a dispute.

23    MR. RAMIREZ:  And we have some general objections,

24    but nothing specifically.

25    THE COURT:  Okay, but in terms -- other than the

1    dollar amounts, is everything about you generally correct?

2            **THE DEFENDANT:**  Yes, your Honor.

3            **THE COURT:**  All right.  I know there's some dispute

4    on what alleged payments to the Sheriff you were involved in

5    and which you weren't, and so we'll address that here in a

6    moment.

7            All right, so let's deal with the issues besides the

8    alleged bribe amounts.

9            **MR. RAMIREZ:**  Yes, your Honor.

10           **THE COURT:**  Because that, let's just save for the

11   end.  It may take some time and I may need some testimony from

12   an agent on that issue as well and it also sort of pertains to

13   Mr. Gonzalez as well.

14           **MR. RAMIREZ:**  And --

15           **THE COURT:**  So the Base Offense Level is 14.  I don't

16   think that's a dispute.  That's general bribery of a public

17   official.  There was more than one bribe, so he got the two

18   point enhancement for that.  He's an elected official.  I'm

19   sorry, he's not an elected official.

20           **MR. RAMIREZ:**  He was not an elected official, Judge.

21           **THE COURT:**  But he is a high ranking official.  You

22   want to talk a little bit more about that or will you concede

23   that applies to a commander of the Sheriff's Office?

24           **MR. RAMIREZ:**  Your Honor, we'll concede to that, in

25   light of the --

1          **THE COURT:**  I think it -- pressing is just -- it

2    pertains to even low level law enforcement officers, a --

3          **MR. RAMIREZ:**  We'll concede to that, your Honor.

4          **THE COURT:**  -- patrol officer.  So it applies to

5    that.

6          And then abuse of position of trust.  I mean that's a

7    pretty obvious two-level enhancement as well.

8          And the obstruction that he got probably --

9          **MR. RAMIREZ:**  We do have an issue with the

10   obstruction, Judge.

11         **THE COURT:**  Right.  And I looked at this issue

12   overnight.  It was brought to my attention yesterday by

13   yourself and the Government.  It did not appear as though it

14   should be assessed here.

15         Does the Government have any more thoughts on that?

16   It seemed like there was --

17         **MR. STURGIS:**  The Government agrees that it should

18   not be assessed because it's not --

19         **THE COURT:**  The instant offense, right.

20         **MR. STURGIS:**  -- (indiscernible) this prosecution.

21         **THE COURT:**  Nor did it actually impede this

22   particular case, whatever, and it's sort of a circuitous

23   argument that his taking bribes obstructed justice, which he

24   was being paid to look the other way or to assist, but that's

25   what he's being punished for, so it seemed also somewhat of a

6

1     double counting.

2             I concur with the Government and the Defense lawyer

3     that I should not assess those two points and I'm not going to.

4             So that just leaves us with the bribe amounts.

5             **MR. RAMIREZ:**  And, your Honor, I'd ask the Court to

6     consider the three point acceptance of responsibility.

7             **THE COURT:**  Oh, yes.  I assume the Government would

8     move for the third acceptance point?

9             **MR. STURGIS:**  It does, your Honor.

10            **THE COURT:**  All right, so I grant his third

11    acceptance point off.

12            All right, so the big issue here in this case, and

13    perhaps the other cases, is what is the amount that Mr. Padilla

14    took, how much did he give to the Sheriff, how much did he

15    keep, when did he get involved, how much of this can ever be

16    accurately calculated?  The Presentence Report chronicles --

17    let's just go through each of them and figure out what evidence

18    there is, if any, on them.

19            And we all agree, this was money -- Mr. Padilla was

20    only involved in money that the Sheriff got from Mr. Gonzalez.

21    He was not involved in the money the Sheriff got allegedly from

22    Mr. Quintanilla.  Right?  He was not involved --

23            **MR. STURGIS:**  Correct, there's another --

24            **THE COURT:**  -- or from Mr. Davila.

25            **MR. STURGIS:**  -- the money that the Court's referring

```
1   from Mr. Quintanilla, came from Mr. Gonzalez as well.  That

2   actually went from Mr. Gonzalez to Mr. Treviño, with

3   Mr. Quintanilla being there for intermediary (indiscernible).

4   Mr. Padilla was not involved with that (indiscernible) --

5               THE COURT:  With that at all.

6               MR. STURGIS:  -- Mr. Gonzalez'.

7               THE COURT:  All right.  So then let's go with the

8   first item.  It is a $40,000 payment.  And these are

9   allegations that were --

10              MR. QUINTANILLA:  Your Honor --

11              THE COURT:  -- made.

12              MR. QUINTANILLA:  -- may I interrupt real quickly?

13              THE COURT:  Uh-huh.

14              MR. QUINTANILLA:  I know it's -- it may involve Mr.

15  Gonzalez and he needs an interpreter.  He has the --

16              THE COURT:  He's not wearing --

17              MR. QUINTANILLA:  Is this being interpreted, your

18  Honor?

19              THE COURT:  He understands some English, doesn't he,

20  as well?  I mean he graduated from Weslaco High School.

21              MR. QUINTANILLA:  I don't think he graduated.

22              MR. STURGIS:  He didn't graduate, your Honor, but I

23  think --

24              MR. QUINTANILLA:  He's always used an interpreter.

25              THE COURT:  All right.  Well --
```

1              **MR. QUINTANILLA:**  I just noticed right now that he

2    didn't have those on.

3              **THE COURT:**  He went first through tenth or eleventh

4    grade here in the United States.  He understands some English,

5    no doubt.  But now he has the interpreting on.  I don't know if

6    these directly deal with him, other than he can dispute or

7    corroborate some of this.

8              **MR. QUINTANILLA:**  Well, if it comes up, I just

9    thought --

10             **THE COURT:**  It may.  And is the agent on this case

11   here?  I don't see -- Reneau (phonetic)?

12             **MR. STURGIS:**  There are several agents here,

13   your Honor.

14             **THE COURT:**  There are, okay.

15             **MR. STURGIS:**  He cut his hair.

16             **THE COURT:**  That happens when you get married.

17             All right.  So -- okay, so let's talk about the first

18   one.  It's in no particular order, this is just the order that

19   they were in the Presentence Report.  Allegedly Sheriff Treviño

20   was going to take a vacation in Las Vegas and he hits up the

21   Defendant, Mr. Gonzalez, for some money and so $40,000

22   allegedly is given to Mr. Padilla to give to Mr. Treviño.  And

23   I don't know that we have much information on it, other than a

24   debrief from whom?

25             **MR. STURGIS:**  Judge, if we -- (indiscernible) and

1    some of this probably could be just done through proffer.  I

2    don't think that --

3              **THE COURT:**  Sure.

4              **MR. STURGIS:**  -- Mr. Padilla would have exception to

5    most of this.

6              Mr. Gonzalez has stated that he did give that money.

7    Mr. Padilla has informed us that he did receive some money from

8    Mr. Gonzalez in reference to Mr. Treviño taking trips.  And --

9              **THE COURT:**  This would be the Las Vegas --

10             **MR. STURGIS:**  -- I believe Mr. Padilla --

11             **THE COURT:**  -- and Colorado trips now we're talking

12   about?

13             **MR. STURGIS:**  Well, I believe that Mr. Padilla would

14   agree that there's two sets of money transactions that refer to

15   trips, per se.

16             **THE COURT:**  Okay, what are those?

17             **MR. STURGIS:**  There were some times where -- a couple

18   of times where Mr. Gonzalez states that he had a discussion

19   about trips and that he believes that he gave money to

20   Mr. Padilla to give to Mr. Treviño for trips.  Mr. Padilla has

21   stated that some of that money was given.  There was also times

22   where Mr. Padilla would have another deputy act as if he was

23   the Sheriff and state that they wanted to get some money to on

24   a trip when in fact Mr. Padilla would get the money --

25             **THE COURT:**  And keep it.

1     **MR. STURGIS:** -- and keep it.  Mr. Padilla has told

2 us that during this -- the extent of this ongoing conspiracy

3 that he received -- that he received somewhere in the

4 neighborhood of about 200,000 and they --

5     **THE COURT:** This is including the trips and then all

6 the campaign stuff?

7     **MR. STURGIS:** This is including everything, is what

8 he's told us.

9     **THE COURT:** All right.

10     **MR. STURGIS:** If I have that correct.  But

11 Mr. Padilla could, you know, obviously clarify.  He says of

12 that 200, he kept about half for himself.  He estimated -- what

13 he has told us, he estimated between ninety and a hundred of --

14     **THE COURT:** And this --

15     **MR. STURGIS:** -- the other being half.

16     **THE COURT:** Okay, so this -- I'm trying to

17 understand, because there are some big numbers here on the

18 campaign stuff.  So the trips, he was given certain funds for.

19 Obviously less than what's alleged here:  40,000 for a trip to

20 Las Vegas, 30,000 to a trip to Colorado.

21     **MR. STURGIS:** Well --

22     **THE COURT:** Mr. Padilla would say it's less than that

23 70,000 that he was given?

24     **MR. STURGIS:** I don't know what he says as to how

25 much of those.  Mr. Gonzalez provided figures that he says he

1    gave for those ventures.

2         THE COURT:  All right.

3         MR. RAMIREZ:  And, your Honor, to shed some light

4    into that, what we have here basically was an evolution and

5    everything started off with campaign donations for the Sheriff.

6         THE COURT:  Was the original money transaction, I

7    assume it was related to the Sheriff's campaign.  What was it

8    for?  Was it cash payment for these raffle tickets, or

9    whatever, barbeque tickets, that I've heard so much about, all

10   these officers were forced to sell?

11        MR. STURGIS:  If you go back, Judge, the timeline

12   goes back to late '10, early '11, which the initial monies

13   coming from Mr. Gonzalez, according to Mr. Gonzalez, was the

14   100,000 straight to Mr. Treviño with Mr. Quintanilla.  Shortly

15   after that 50,000 straight to Mr. Treviño.  After that time is

16   when --

17        THE COURT:  And that was late 2010?

18        MR. STURGIS:  Late 2010, beginning of 2011.

19        THE COURT:  So --

20        MR. STURGIS:  In March of 2011 Mr. Gonzalez's

21   property there in Weslaco was raided by some deputies.

22        THE COURT:  All right, so --

23        MR. STURGIS:  Subsequent to that --

24        THE COURT:  So that's how we can date the money on

25   the eight-liners situation.

1          **MR. STURGIS:**  Right, that was prior to that --

2          **THE COURT:**  Okay.

3          **MR. STURGIS:**  -- prior to the seizure of the

4    marijuana.

5          Mr. Padilla has stated that he didn't have any

6    involvement, didn't have anything to do with Mr. Gonzalez prior

7    to the seizure of marijuana.

8          **THE COURT:**  All right, and the arrest --

9          **MR. STURGIS:**  Based on other --

10          **THE COURT:**  -- the arrest of his nephew.

11          **MR. STURGIS:**  Right.  Based on other --

12          **THE COURT:**  (Indiscernible)

13          **MR. STURGIS:**  -- co-conspirators, that seems to be

14    corroborated based on the events that have happened.  Mr. Julio

15    Davila has stated that he was contacted in regards to that

16    event in March of 2011.  He tried to make some things happen in

17    regards to marijuana being seized and people being arrested.

18          **THE COURT:**  So Mr. Gonzalez reaches out to Julio

19    Davila saying, hey, this thing just happened at my --

20          **MR. STURGIS:**  Right, through Mr. Quintanilla to

21    Mr. Davila, that's the introduction of Mr. Davila in this.

22          **THE COURT:**  And that's how they get to the Sheriff.

23          **MR. STURGIS:**  Based on Mr. Davila's activities and

24    the way he presented himself, Mr. Gonzalez believed that

25    Mr. Davila was part of the Sheriff's Department, so he believed

1    that he would have connections to be able to help with the

2    marijuana and the arrest of his nephew.  Obviously, that is not

3    correct.  Mr. Davila had no connection as far as employment

4    with the Sheriff's Office.

5          It was at that time that Mr. Davila begins receiving

6    monies from Mr. Gonzalez for Mr. Treviño's campaign.  Some of

7    those monies, according to Mr. Davila and Mr. Gonzalez and

8    Ms. Palacios (phonetic), were given straight to

9    Sheriff Treviño --

10         **THE COURT:**  Right.

11         **MR. STURGIS:**  -- from Mr. Davila.  Other monies, and

12   Mr. Padilla has confirmed this, were given to Mr. Padilla from

13   Mr. Davila, so Mr. Gonzalez to Mr. Davila to Mr. Padilla, to

14   give for the campaign.

15         **THE COURT:**  Okay, but who involved Mr. Padilla in

16   that?  Did Treviño say --

17         **MR. STURGIS:**  We haven't got there.  Shortly after

18   that stage is where Mr. Treviño decides that he wants

19   Mr. Davila to be out of the picture and then has Mr. Davila

20   introduce Mr. Padilla to Mr. Gonzalez so that he is the conduit

21   instead of Mr. Davila, takes a peg out, if you will.

22         **THE COURT:**  All right, so --

23         **MR. STURGIS:**  From that beginning, your Honor, is

24   where Mr. Padilla is involved --

25         **THE COURT:**  Okay.

14

1          **MR. STURGIS:**  -- with Mr. Gonzalez.

2          **THE COURT:**  And this happens -- so the Sheriff

3    substitutes Mr. Padilla for Mr. Davila because he doesn't trust

4    Mr. Davila, or whatever, and this happens after the incident

5    at -- the seizure of --

6          **MR. STURGIS:**  Correct.

7          **THE COURT:**  -- the marijuana load --

8          **MR. STURGIS:**  The seizure is in March of 2011.

9    Mr. Padilla is introduced roughly probably sometime May/June of

10   2011, May or June of 2011 to Mr. Gonzalez.

11         **MR. RAMIREZ:**  That's correct, Judge.

12         **THE COURT:**  All right.

13         **MR. RAMIREZ:**  And that's where we can date

14   Mr. Padilla's contact.

15         **THE COURT:**  All right, so the Sheriff, what, orders,

16   instructs Mr. Padilla go meet with Mr. Gonzalez or how does

17   that --

18         **MR. STURGIS:**  According to Mr. Padilla and

19   Mr. Davila.

20         **THE COURT:**  We're all in the Weslaco area, though.  I

21   mean he probably knew him, knew of him, I mean the arrest --

22   no?  So Mr. Treviño says I want you to go meet this special

23   friend of mine?  How does that work?

24         **THE DEFENDANT:**  Well, it was through Julio Davila --

25         **THE COURT:**  Okay.

1          **THE DEFENDANT:**  -- who -- it first started when the

2   Sheriff sent me to Julio Davila's house --

3          **THE COURT:**  Sure.

4          **THE DEFENDANT:**  -- to go look at sample political

5   sign.  And, apparently, sample political sign he got from Tomas

6   Gonzalez, who purchased quite a bit of them.

7          **THE COURT:**  All right, so that was --

8          **MR. STURGIS:**  That was the connection.

9          **THE COURT:**  I thought your involvement was before the

10  signs.  No.  So the political signs were being made there in

11  Weslaco.  Mr. Rojas talked about them, all this --

12         **MR. STURGIS:**  There were two batches of signs.

13         **MR. RAMIREZ:**  Right.

14         **MR. STURGIS:**  The initial batch of signs --

15         **THE COURT:**  The bad batch --

16         **MR. STURGIS:**  -- was a bad batch that was a small

17  batch.

18         **THE COURT:**  Sure.

19         **MR. STURGIS:**  Those were the signs that Mr. Padilla

20  went to witness on behalf of --

21         **THE COURT:**  Okay.

22         **MR. STURGIS:**  -- the Sheriff.

23         **THE COURT:**  And they weren't colorful enough.

24         **MR. STURGIS:**  Correct.

25         **THE COURT:**  And they didn't have the disclaimer.  So

1    then another batch was then printed up or --

2          **MR. STURGIS:**  Correct.

3          **THE COURT:**  Okay.  And again, this is now middle of

4    2011?

5          **MR. STURGIS:**  This is, yes, close to the middle of

6    2011.

7          **MR. RAMIREZ:**  And this --

8          **MR. STURGIS:**  I think the way to date it was emails

9    from Mr. Treviño to the person making the signs.  Those are

10   dated late May of 2011.  So at that point Mr. Pa -- excuse

11   me -- Mr. Treviño was aware that this person is making signs on

12   his behalf.  Mr. Padilla then becomes a conduit some way with

13   that, because Mr. Gonzalez is paying for the signs.

14         **THE COURT:**  All right.  I need to take about a five-

15   minute rest break.  But I also diagramed all of this and I left

16   it on my desk, so let me -- let's take about a ten-minute

17   recess and then we'll pick right back up.

18      **(A recess was taken from 11:10 a.m. to 11:30 a.m.; parties**

19   **present)**

20         **THE COURT:**  Okay, so Mr. Sturgis, you had the floor.

21   You were about to explain to me some connections.  And I

22   actually have a diagram to help me understand.

23      **(Pause)**

24         You can look at the monitor or you can look there.

25      **(Pause)**

1          Sorry, my monitor is not working.  All right, there

2    it is.

3          **(Pause)**

4          All right, let me scoot it up there a little bit.

5          All right, so I want to talk about this conspiracy on

6    the far right.  You can see my cursor moving.

7          All right, so this is what I don't understand, is

8    this connection that you were describing, Mr. Sturgis.  I had

9    understood that Mr. Davila was never directly involved with

10   El Gallo and the Sheriff, but he was.

11         **MR. STURGIS:**  He was, correct, your Honor.  He was

12   directly involved with Mr. Gonzalez, El Gallo.  Prior to

13   Mr. Padilla, he knew Mr. Gonzalez.

14         **THE COURT:**  All right.

15         **MR. STURGIS:**  He was -- Davila was the go-between on

16   behalf of the Sheriff, the go-between between Mr. Gonzalez and

17   Mr. Treviño.  In the beginning Mr. Davila would receive some

18   money from Mr. Gonzalez and he would provide it directly to

19   Mr. Treviño or to Mr. Padilla to give to Mr. Treviño.  This is

20   based on conversations with Mr. Davila, Ms. Palacios, and

21   Mr. Padilla, as well as Mr. Gonzalez stating he gave money to

22   Mr. Davila.

23         After the seizure in March of 2011 of the marijuana

24   in Mr. Gonzalez's property, and based on the fact that

25   Mr. Gonzalez had put up a large number of signs in the area and

1    how obvious the property may be involved in narcotics

2    trafficking, Mr. Treviño allegedly received some indication

3    that it was apparent that it didn't seem right that

4    Mr. Gonzalez, who was -- appeared to be involved in narcotics

5    traffic and money laundering, had all this support from

6    Mr. Treviño.  So Mr. Treviño apparently felt some heat from the

7    fact that Mr. Gonzalez was advertising his connection to

8    Mr. Treviño.  That, in connection with Mr. Treviño wanting to

9    remove Mr. Davila out of the picture, per se, at the behest of

10   Mr. Treviño, Mr. Padilla went over to Mr. Davila's location at

11   his house, saw the signs, and then Mr. Davila introduced

12   Mr. Padilla directly to Mr. Gonzalez for the purpose of being a

13   conduit to have Mr. Gonzalez deliver his money to the Sheriff.

14          **THE COURT:**  All right.  And so you knew Mr. Davila

15   previously because he hosts parties, pachangas, for political

16   candidates and you've been probably to one of these parties,

17   just met him through the political process of campaigning,

18   right?

19          **THE DEFENDANT:**  Yes, your Honor.

20          **THE COURT:**  And I know he's in the bail bonds

21   business.  I don't know if you deal directly with people like

22   that, but I assume on occasion you did as well?  You'd have

23   dealt with him on a professional basis, not just socially, as

24   well?

25          **THE DEFENDANT:**  Yes, sir.

1          **THE COURT:**  And did you know also his -- I want to

2    say Arnulfo Davila, his brother?

3          **THE DEFENDANT:**  Yes, your Honor.

4          **THE COURT:**  Who worked, I guess, in the same

5    business?

6          **THE DEFENDANT:**  Yes, your Honor.

7          **THE COURT:**  Worked for him?  And was he also involved

8    with El Gallo and the Sheriff, Arnulfo, or just sort of the

9    right-hand man of Julio Davila?

10         **MR. STURGIS:**  He was very verbally involved, but he

11   was more running errands to get money at times.  He was not

12   directly involved as far as any of the decision making or what

13   to do.  He would just do as Mr. Julio Davila asked him to do

14   instead of himself going over.

15         **THE COURT:**  All right.  So for about six months,

16   Mr. Treviño dealt with El Gallo through either Quintanilla or

17   Davila and then Padilla took over as the intermediary.

18         **MR. STURGIS:**  Yes, probably in the neighborhood of

19   four to five months.  As I was saying, there were emails that

20   were obtained from Mr. Treviño's email to the person making the

21   signs.  That was after Mr. Gonzalez, Mr. Quintanilla, and

22   Treviño met where Mr. Gonzalez says that he provided the

23   100,000 and the 50,000.  That's the initial.  Then there is the

24   introduction of Mr. Davila.  Mr. Davila being the conduit to

25   Mr. Gonzalez.  Then the introduction of Mr. Padilla.

1          Mr. Padilla was involved at the same time -- became

2    involved at the same time the signs were being made, a batch of

3    signs were being made.  As he stated, he observed the first

4    signs that were no good and then he became involved about the

5    time that the second set of them being made.  Emails from

6    Mr. Treviño to the person making the signs involved a second

7    batch of signs.  That's in late May.  So you can pretty much

8    estimate that Mr. Padilla became involved with Mr. Gonzalez

9    sometime in the May area, middle May through June.

10         **THE COURT:**  All right.  And so then the initial money

11   was campaign related and then it became trips also?

12         **MR. STURGIS:**  The initial money, as I understand from

13   Mr. Padilla and Mr. Gonzalez, started out -- the first time

14   Mr. Padilla went, it was a small amount, a couple of thousand

15   dollars.  And then at that point it just started to evolve into

16   bigger amounts.

17         **THE COURT:**  But, see, that's what I don't understand.

18   If Davila had already paid the Sheriff $150,000 --

19         **MR. STURGIS:**  No, Mr. Davila wasn't involved in

20   that --

21         **THE COURT:**  I'm sorry.  I'm sorry.  If Mr. -- I'm

22   sorry, I'm pointing to Gonzalez -- Mr. Gonzalez had already

23   paid Mr. Treviño $150,000 in two transactions, one of a

24   hundred, one of fifty, why is he now giving him $2,000?

25         **MR. STURGIS:**  Because, as everybody's saying, this is

1    Mr. Padilla's --

2              **THE COURT:**  First, yeah.

3              **MR. STURGIS:**  -- first stint that we're going

4    through.  Mr. Padilla was unaware, would have no reason to be

5    aware of the $150,000.

6              **THE COURT:**  Sure.

7              **MR. STURGIS:**  Based on everybody's statements, it

8    seems apparent that Mr. Treviño wanted to distance himself from

9    being directly connected to Mr. Gonzalez --

10             **THE COURT:**  Okay.

11             **MR. STURGIS:**  -- so he sent Mr. Padilla -- when

12   Mr. Padilla would go over, to the Government's knowledge based

13   on what everybody's saying, there was no set amount of money

14   that he was sent to retrieve.  He would go over, it was known

15   at that time, okay, I'm here because I want to get some money.

16   Mr. Gonzalez would determine how much of the currency he was

17   going to give to Mr. Padilla.  At times they would --

18   Mr. Padilla would sell ideas or tell Mr. Gonzalez about things

19   that the Sheriff wanted to do with the campaign, such as golf

20   tournaments, skeet shoots, those kind of things, and

21   Mr. Gonzalez would then retrieve some of the currency, give it

22   to Mr. Padilla and Mr. Padilla would then transfer it over to

23   either the Sheriff or Ms. Medina.  Along that line is when

24   Mr. Padilla started to decide for himself, well, if I'm going

25   to be transferring all this money, I should keep some of the

22

1    money myself.

2         THE COURT:  And was there always kind of a reason for

3    money?  I mean it wasn't just for protection, it was always

4    sort of a we need this for buying fajitas for a barbeque or we

5    need this for a hole sponsorship for the golf course?  Was

6    there always some kind of a ruse for --

7         MR. STURGIS:  Not all the time, but a number of the

8    times.  I believe the estimates that Mr. Gonzalez and Mr.

9    Padilla have provided the Government is that they believe Mr.

10   Gonzalez gave somewhere in the neighborhood of $70,000 for the

11   golf tournament that was held at Tierra Santa (phonetic).

12        THE COURT:  And one time or --

13        MR. STURGIS:  In pieces.

14        THE COURT:  In pieces.  In pieces, okay.

15        MR. RAMIREZ:  And this coincides with the fundraising

16   activity, your Honor, for the Sheriff's campaign for the 2012

17   March primary, the Democratic primary, which the fundraising

18   starts June 2011.

19        What you see in June of 2011, when Mr. Padilla first

20   met Mr. Gonzalez, is immediately there was a skeet shoot and

21   what you have is following the skeet shoot in November you have

22   the golf tournament at Tierra Santa.  So this is --

23        THE COURT:  That's November?

24        MR. RAMIREZ:  November 2011.  So when Mr. Padilla

25   would make his trips to go visit Mr. Gonzalez it was under the

1   guise that it was a campaign contribution.  And the culture of

2   the Sheriff's Office was 24 hours a day, 365 days a year we

3   were fundraising, regardless of how much I spent on my last

4   campaign, regardless of how much I had in my war chest, we're

5   campaigning, guys, and we need to hit the streets, pound the

6   pavement, and we need to have good contacts on people who are

7   willing to pay for these fundraisers and for my campaign.  That

8   Democratic primary of 2012 was when Mr. Lupe Treviño was being

9   challenged by Mr. Caples.

10          **THE COURT:**  And there was another gentleman.

11          **MR. RAMIREZ:**  It was Mr. Hernandez was in the primary

12   individual elections.

13       **(Voices overlap)**

14          **THE COURT:**  Okay, so, again, it's this pressure to

15   fundraise at all costs, whatever, legal, illegal, it didn't

16   matter where the money was coming from, that began this scheme.

17   But then it evolved then into, well, not only for the campaign,

18   but I want to take a trip to Las Vegas, I want to take a trip

19   to Colorado, and I need money for that?

20          **MR. STURGIS:**  That's the information that has been

21   provided.

22          **THE COURT:**  That's sort of what it evolved to?  Was

23   that sort of in the middle of this time?  When were those

24   trips?

25          **THE DEFENDANT:**  During the same time period.

24

1          **THE COURT:**  During the same time period?

2          **THE DEFENDANT:**  Yes, your Honor.

3          **THE COURT:**  Okay.  And then we've heard a lot of

4    information about the boat.  I've hear about it at least in one

5    trial, maybe two trials, and then it's come up here because --

6          **MR. STURGIS:**  The information about the boat,

7    your Honor, is that Mr. Treviño made it known that he wanted to

8    get a boat or fix up a boat and make it new essentially.  In

9    essence, he did buy a boat and did buy a motor for it.  That's

10   accounted.  He sold that.  But according to Mr. Gonzalez, the

11   $50,000 that was accepted directly -- or direct transaction to

12   Mr. Treviño, Mr. Treviño showed up and informed Mr. Gonzalez

13   that he wanted to get a boat and he was looking at this boat,

14   so Mr. Gonzalez retrieved $50,000 and said, here, will this

15   cover it essentially.  At the same time information coming from

16   Mr. Padilla and the other deputies is Mr. Treviño was over at

17   the Sheriff's Office telling people he wanted a boat, implying

18   for them to go get money brought in for the boat.

19         **THE COURT:**  Right, because Fernando Guerra Sr.

20   (phonetic) says he gave money for a boat.  I think he said

21   6,000.  And then J.P. Flores (phonetic) also testified that he

22   had to go and ask people for money for the Sheriff's boat and

23   he talked about delivering that money in cash to your office,

24   actually, and he had an envelope that said, whatever, the

25   Sheriff's Boat Fund or something, and that that was going to be

1  given to the Sheriff as a gift or something so that he could go

2  buy this boat.

3       Did that all happen?

4       **THE DEFENDANT:**  It --

5       **THE COURT:**  It did?

6       **THE DEFENDANT:**  It started out that way, yes, sir,

7  but it never developed, they never came through.  They wanted

8  to -- they actually only brought me $1500.

9       **THE COURT:**  That was the most that was raised?

10      **THE DEFENDANT:**  That was it.  And a thousand was from

11  J.P. Flores and 500 from Fabian Rodriguez (phonetic).

12      **THE COURT:**  But no other deputies would come up with

13  any money?

14      **THE DEFENDANT:**  It was just a few, a handful, of

15  guys.  It was Fabian Rodriguez, J.P., Jerry Del Angel

16  (phonetic) and Eloy Cantu (phonetic) and myself.  We decided we

17  were going to help out the Sheriff.  Because he came to my

18  office --

19      **THE COURT:**  Little did you know he'd already gotten

20  50,000 for the boat.

21      **THE DEFENDANT:**  Yes, sir.

22      **THE COURT:**  And was there a boat actually purchased

23  at this time?

24      **MR. STURGIS:**  Yes, your Honor.

25      **THE COURT:**  All right.  So maybe they buy a hundred

26

1    thousand dollar boat and he writes a check for 50,000 and cash

2    just paid for remainder or how --

3             **MR. STURGIS:**  No, the boat was -- the boat total

4    was -- the boat and motor total was somewhere in the

5    neighborhood of about 30,000.

6             **THE COURT:**  Was that the actual value of the boat or

7    is this one of these deals where the boat's really worth 50,

8    I'm going to write you a check for 30 and then here's the other

9    20?

10            **MR. STURGIS:**  No, that's pretty close to the

11   actual --

12            **THE COURT:**  Okay.

13            **MR. STURGIS:**  -- amount of the boat.  The boat owner

14   says that it's been sold now.

15            **THE COURT:**  All right.  All right, so we digressed a

16   little bit.  Well, not actually.  We're still -- I think I

17   understand now the connection there.

18            So about half the money that comes through for the

19   Sheriff then you begin keeping for your own personal use or is

20   half you're keeping for your personal use and for campaign

21   expenses?  That's what I didn't really understand.

22            **THE DEFENDANT:**  Well, it's for both really,

23   your Honor.

24            **THE COURT:**  Because obviously if 60,000 comes in for

25   the skeet shoot or 70,000 comes in for the golf tournament,

1    there are actual expenses for the golf tournament.  And so do

2    you actually use all of that, none of that, some of that for

3    the golf tournament?

4            THE DEFENDANT:  Well, that's just it, the Sheriff

5    wanted all the donations, even collected for the campaign

6    fundraisers, to go directly to him.  We had to find a way to

7    pay for the expenses ourselves.  He didn't want to use none of

8    that money that --

9            THE COURT:  None of the cash even?

10           THE DEFENDANT:  -- was for --

11           MR. STURGIS:  According to Mr. Padilla, it was as if

12   he was double dipping.  When he had the golf tournament, per

13   se, all the teams that signed up or paid an entry fee, so they

14   had that thing for a lot of the -- the golf course, the food,

15   that kind of stuff, that's what the entry fee is for to cover.

16   At the same time you have fundraising going on the side, in

17   this case Mr. Padilla getting monies out of Mr. Gonzalez, that

18   money is also provided.  So you have payment on this side for

19   it, but you're also taking in money over here, so you're always

20   going to have a windfall of a lot of money coming off of --

21           THE COURT:  But I don't understand how the expenses

22   then paid for.  If you have revenues, legitimate documented

23   revenues, team fees --

24           MR. STURGIS:  Correct, that pays for the --

25           THE COURT:  -- and you have what I'm going to call as

1    dirty money coming in in cash, how are you paying for the

2    expenses?  With the this --

3              **MR. STURGIS:**  It was that money.

4              **THE COURT:**  -- with the dirty money?  With the

5    legitimate money you're paying the country club, you're paying

6    the caterer.

7              **MR. STURGIS:**  Well, in this case it was Tierra Santa,

8    but that was donated.  So there's no cost associated with --

9              **MR. RAMIREZ:**  Right.

10             **MR. STURGIS:**  -- the golf course.  He had to pay for

11   the food, the --

12             **MR. RAMIREZ:**  Reimburse volunteers --

13             **THE COURT:**  And is that --

14             **MR. RAMIREZ:**  -- actual expenses, the door prizes,

15   TVs.

16             **THE COURT:**  Were those through checks from that

17   campaign or were those through --

18             **MR. STURGIS:**  Those were all put into an account and

19   then --

20             **THE COURT:**  No, you were paying cash for them.

21             **THE DEFENDANT:**  We had to pay cash on our own.

22             **MR. RAMIREZ:**  Do you have a situation where the

23   directive from the Sheriff, your Honor, was you all go raise

24   all this money for these events, but on the day of the event

25   I'm not going to pay anything out of pocket from the campaign,

1   you all need to figure out how to have that money.  So where

2   this evolved from was the money was being kept in order to

3   cover some of those expenses and it evolved into something a

4   little different later on in time.

5          THE COURT:  All right.  Okay, so that's the campaign

6   money, that's the trip money, then there was some money you

7   asked Mr. Gonzalez for to pay for Jonathan Treviño's lawyer?

8   Yes?  No?

9          THE DEFENDANT:  Yes, your Honor.  I did ask him,

10  but --

11         THE COURT:  Who put you up to that or did you do it

12  on your own?

13         THE DEFENDANT:  I had to come up with ways to get

14  more money out of him.  After I already collected or solicited

15  money for a certain fundraiser he already had given me, I had

16  to get more.

17         THE COURT:  Ah, so this was a ruse.  You said, hey,

18  we need money for his --

19         THE DEFENDANT:  I had to turn in money weekly to the

20  Sheriff.

21         THE COURT:  Okay.  Okay.  That's right, so that money

22  didn't actually go to his lawyer, but that's the -- sort of the

23  ruse in order to come up with money you had to give the

24  Sheriff.

25         THE DEFENDANT:  Yes, your Honor.

1          THE COURT:  When you say you were having to give

2    money to the Sheriff every week, did you ever give it to him in

3    cash?

4          THE DEFENDANT:  He actually told me he just wanted

5    cash.

6          THE COURT:  And what was it used for?  You could see

7    it wasn't going into the campaign, or wasn't legitimately going

8    into the campaign.

9          THE DEFENDANT:  No.

10          THE COURT:  Was he just living high?  I mean would

11   you ask him, well, how is this helping the campaign, Sheriff?

12          THE DEFENDANT:  I never asked him.  The only one who

13   could ask him was his chief of staff.

14          MR. RAMIREZ:  That would be Vince and Pat Medina

15   (phonetic), Judge.

16          THE DEFENDANT:  Pat Medina.

17          THE COURT:  All right.  And would you have to turn

18   money over to her?

19          THE DEFENDANT:  When he wasn't around, I did as well;

20   yes, sir.

21          MR. RAMIREZ:  There was usually a reference to a

22   campaign debt, your Honor.  That was never verified, but there

23   was always reference to this last election cost me "X" so

24   there's a campaign debt that we need to extinguish.  It became

25   a situation where the directive from the Sheriff to Mr. Padilla

1   was such that I don't want any checks, I want cash.

2           **THE COURT:** All right.  So, Mr. Sturgis, what -- this

3   is the last issue on Mr. Padilla, dollar amounts.  We think

4   that it's -- the actual amount is between 120 and 200 that he

5   benefited?

6           **MR. STURGIS:** That he benefited or that he received?

7           **THE COURT:** Well, we can talk about either.

8           **MR. STURGIS:** I don't think there's any doubt --

9           **THE COURT:** Or both.

10          **MR. STURGIS:** -- even by his own calculation, what he

11  received from Mr. Gonzalez would be in the 120 to 200.

12          **THE COURT:** Okay.

13          **MR. STURGIS:** I think, based on Mr. Padilla's

14  statements, that what he kept personally would have been

15  between 70 and 120.

16          **THE COURT:** All right.

17          **MR. STURGIS:** This seems somewhat corroborated in

18  that, not including the initial 150.

19          **THE COURT:** Right, yeah, because Mr. Quintanilla had

20  to do with that.  He had nothing to do with that.  And Davila

21  maybe had to do with that.

22          **MR. STURGIS:** No, Mr. Davila did not, but --

23          **THE COURT:** Okay, Quintanilla.

24          **MR. STURGIS:** But if you take that amount out, then

25  based on Mr. Gonzalez's estimates, he didn't keep detailed

1  reports of it, but based on his estimates he says that he

2  thinks he gave somewhere in total, including the 150, between

3  400 and 500,000.

4        **THE COURT:**  So if you back out the 150 --

5        **MR. STURGIS:**  So you back out the 150, if you take it

6  off of the low-end, 400, you're saying that 250,000 that would

7  have involved either Mr. Davila or Mr. Padilla.

8        **THE COURT:**  All right.

9        **MR. STURGIS:**  So you're on the cusp.  You're right on

10  the --

11        **THE COURT:**  But some of this money went straight to

12  Davila to Treviño and didn't include Mr. Padilla.  I mean we

13  can recall --

14        **MR. STURGIS:**  Some of it went to Mr. Davila to

15  Mr. Padilla to the Sheriff.  He was just another step in the

16  money transfer at that point.  Based on Mr. Padilla's

17  statements, when it was going from Mr. Gonzalez initially to

18  Mr. Davila to Mr. Padilla to the Sheriff, Mr. Padilla didn't

19  keep any of that money.  It wasn't until he was dealing

20  directly with Mr. Gonzalez.

21        So the Court's first question it appears would be is,

22  if you took the cumulative off of what he kept and what was

23  given to the Sheriff in some form or fashion coming from Mr.

24  Gonzalez, you're right on the cusp of 200,000, which would be

25  the guideline of which way you go.  Based on what he kept and

33

1    what the Government's aware of, if the Court's looking at that,

2    you're in the 70 to 120.

3            THE COURT:  All right, so -- and the -- I don't know

4    if it's coincidence, but that's -- the relevant conduct that

5    the Sheriff was held to on his case was about a hundred

6    thousand?

7            MR. STURGIS:  Correct, 70 to 120 range, based on

8    that's the money that he says he got.

9            THE COURT:  He got.

10           MR. STURGIS:  The Court was aware of the 150, but I

11   don't believe took that into account on his guideline

12   calculations.

13           THE COURT:  Okay.

14           MR. STURGIS:  Again, that wouldn't involve

15   Mr. Padilla, that would --

16           THE COURT:  No.

17           MR. STURGIS:  -- involve Mr. Quintanilla.

18           THE COURT:  But so in other words, this would be

19   consistent with the other Court's finding of Mr. Padilla

20   keeping about a hundred thousand, because the Sheriff also kept

21   about a hundred thousand, and you're saying basically about

22   fifty/fifty, about half the money made it all the way and the

23   other half of the money stayed with Mr. Padilla.  Is that --

24           MR. RAMIREZ:  That's accurate, your Honor.  I think

25   the amount of money that Mr. Padilla kept is in the

34

1   neighborhood of that range of 70 to 120.  To narrow it down,

2   we'd say 90 to a hundred.

3          I will offer to the Court that Mr. Padilla

4   voluntarily returned 30,000 of that during the time he was

5   cooperating with the Government.

6          **THE COURT:**  All right.  So that's a plus eight.  Let

7   me see what that does then.

8          Twenty-seven after acceptance?  Is that what you all

9   come up with?

10          **MR. RAMIREZ:**  That's correct, Judge.

11          **THE COURT:**  Ms. Canales, you got that also?

12          **PROBATION OFFICER CANALES:**  Yes, your Honor.

13          **THE COURT:**  Twenty-seven, and no criminal history.

14   So your range is 70 to 87 months.  But you cooperated with the

15   Government, testified in at least one trial, so let's take up

16   the issue of the sealed motion.

17          You want to approach the bench on that?

18          **MR. STURGIS:**  Yes, your Honor.

19          **(Sealed bench conference from 11:53 a.m. to 11:59 a.m.**

20   **omitted)**

21          **THE COURT:**  All right.  Mr. Padilla, you get to speak

22   as well before I sentence you.  It's your right to do so.  You

23   don't have to say anything, but if you'd like for me to

24   consider anything more now is your chance to speak.

25          **THE DEFENDANT:**  I prepared a brief statement, if it's

1   okay, your Honor.

2          THE COURT:  Absolutely.

3          THE DEFENDANT:  As a former leader of the Hidalgo

4   County Sheriff's Office --

5          THE COURT:  Speak up a little bit.

6          THE DEFENDANT:  As a former leader of the Hidalgo

7   County Sheriff's Office, it was not my intention to cause hurt

8   or disappoint to my family, the community, or fellow law

9   enforcement officers.  In retrospect, I know the situation that

10  I currently in -- I'm currently in resulted from the

11  inexcusable lack in judgment and moral behavior on my .  While

12  it is by no means an excuse for my behavior, knowing the cause

13  will help me guard against future mistakes.  While it was an

14  embarrassing and life altering experience, it is an experience

15  I intend to learn from.  Aside from my family, I lost the one

16  thing that I live for, my job.  By the same token, I lost the

17  trust of lawmen in the community.  I understand that my

18  behavior was unethical.  This has taught me that the

19  consequences are not worth the legal ramifications.  So again,

20  I am deeply sorry.

21         THE COURT:  All right.  It does seem that there was

22  no moral compass at the Sheriff's Office and I believe that

23  that was driven from the top down.  And you were in a situation

24  where it's hard to resist the demands of the Sheriff, your

25  employer, your boss, and that's what initially got you into

1    this.

2              There are a couple of things that benefit you.  One

3    is that you accepted your responsibility early in this case and

4    agreed to testify in a trial, which you did.  You also

5    voluntarily testified at a sentencing hearing.  And were

6    working at the behest of the Sheriff, who I believe deserves

7    the larger sentence.

8              Although your guideline range came out to more, it's

9    because of what you pled to, what you didn't.  That other Judge

10   didn't consider additional conduct, for whatever reason.  And

11   so you're going to end up with a lesser sentence than him

12   today, which I believe is appropriate, given what all you've

13   done.

14             I know this has been a lesson to you and that this

15   isn't the kind of conduct you will engage in again.  You're

16   going to be on supervised release for a number of years when

17   you get out of prison.  I hope you'll spend your time in prison

18   productively and then when you get out perhaps this experience

19   will be something that you can share with others so that they

20   avoid making these terrible mistakes that you've made in life.

21             And the fact that you returned 30,000 of the 90,000

22   that you had obtained is also a benefit to you.  No one else

23   has returned any money.  So I'm considering that in assessing

24   the appropriate sentence for you.

25             Does the Government have anything more they wanted to

37

1   add?

2           **MR. STURGIS:**  No, your Honor.

3           **THE COURT:**  All right.  And again, we've met on this

4   case numerous times and I'm aware of the Government's position.

5           All right, so the Court adopts the factual findings

6   contained within the Presentence Report.  As I mentioned, this

7   results in a Total Offense Level of 27 after making the

8   findings that I mentioned earlier.  However, I grant the

9   Government's sealed motion and therefore, pursuant to the

10  Sentencing Reform Act of 1984, it's the judgment of the Court

11  the Defendant, Mr. Padilla, is committed to the custody of the

12  Bureau of Prisons to be imprisoned for a term of 38 months.

13          I'm going to place him on supervision for three

14  years.  While on supervision he is not to commit another

15  federal, state, or local crime, he's to comply with the

16  standard conditions that have been adopted by this Court, abide

17  by any mandatory conditions required by law, and in addition

18  not to possess a firearm or other destructive device, and to

19  cooperate in providing a DNA sample.

20          I find Mr. Padilla cannot afford to pay a fine, so I

21  it, but he is assessed a $100 special assessment, which is

22  payable immediately.

23          And, Mr. Padilla, you can appeal.  You'd have two

24  weeks to do so.  If you could not afford the cost of an appeal,

25  you could ask that I waive these costs of an appeal.

1          And your sentence, while it's significant, it is also

2  a significant departure from your guideline range and it is

3  because I am convinced that but for your cooperation with the

4  Government that the conviction of Sheriff Treviño would not

5  have occurred in the manner and quickness that it did and that

6  it was your decision to assist the Government in specifically

7  the Sheriff's case that I think merits your reward, and so to

8  some extent you are to be thanked for making that decision.

9          Anything else you want to say?

10         MR. RAMIREZ:  Your Honor, just two requests on behalf

11  of my client.  One, that the Court make a recommendation to the

12  Federal Bureau of Prisons that he be located at the Bastrop

13  facility.

14         THE COURT:  So recommended.

15         MR. RAMIREZ:  And taking into consideration he's

16  former law enforcement, that -- with respect to security

17  concerns in that regard.

18         THE COURT:  All right.

19         MR. RAMIREZ:  Second of all, if he may be able to

20  turn himself in at that facility once he's notified as to a

21  date and time to turn himself in.

22         THE COURT:  All right.  And again, there's a health

23  situation that I know Mr. Padilla has.  I'll allow that, to

24  avoid the problems that happen commencing the sentence here in

25  a local facility.

39

1          Are there remaining counts?  Have we dismissed all

2     the other counts as to this Defendant?

3          **MR. STURGIS:**  Your Honor, I believe there's one other

4     count.  The Government would move to dismiss the remaining

5     count.

6          **THE COURT:**  All right, so ordered.

7          All right, Mr. Padilla, best of luck to you, sir.

8          **THE DEFENDANT:**  Thank you, your Honor.

9          **THE COURT:**  You're excused at this time.

10        **(This proceeding was adjourned at 12:05 p.m.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the
electronic sound recording of the proceedings in the above-
entitled matter.


_____        _November 21, 2014_


TONI HUDSON, TRANSCRIBER